Filed 10/20/21  Garcia v. Poker Flat Property Owners Assn. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| MARIAN GARCIA, | C087704 |
| Plaintiff and Appellant, | (Super. Ct. No. 16CV41403) |
| v. | |
| POKER FLAT PROPERTY OWNERS ASSOCIATION, INC., | |
| Defendant and Respondent. | |

Marian Garcia sued her former employer, Poker Flat Property Owners Association, Inc. (Poker Flat), alleging she was wrongfully terminated in retaliation for reports she made to Poker Flat's board members concerning sexual harassment and other claimed violations of law.  She also asserted causes of action for breach contract, breach of the implied covenant of good faith and fair dealing, defamation, intentional infliction of emotional distress, negligence, invasion of privacy, and fraud.  The trial court granted

1

Poker Flat's motion for summary judgment and thereafter entered judgment in the association's favor. Garcia appeals. We affirm.

BACKGROUND

In accordance with the standard of review, we recite the facts in a light favorable to Garcia as the losing party. (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

### Garcia's Employment with Poker Flat

Garcia began her employment with Poker Flat in February 2006. She was hired to be Poker Flat's office manager. Poker Flat is a property owners association located at Lake Tulloch in Calaveras County. The association is governed by an elected board of directors (Board). At the time Garcia's employment was terminated in October 2015, the president of the Board was Stuart Mumm and the vice-president was Jerry Brock. Garcia reported directly to Mumm.

Poker Flat maintained a boat launch and docks on the lake and charged association members to use these facilities. Members would pay a fee for a boat sticker and gate card to access the gated community and boat launch. Garcia's job duties included collecting these fees, issuing the boat stickers and gate cards, depositing the money received into the bank, and keeping track of these payments and deposits. In addition to her office management duties, Garcia was also the Board's secretary. In that capacity, she prepared Board agendas, recorded the minutes of Board meetings, prepared reports and other documents, and implemented directives related to the operation of the office.

Garcia supervised various office assistants during her employment with Poker Flat, including Stacy Halstead, who was hired in 2013 and reported to Garcia until August 2014, at which point she began reporting to Poker Flat's property manager, Sheldon Toso.

***Circumstances Leading to Garcia's Placement on Administrative Leave***

In late August 2015, Halstead noticed certain discrepancies between the ledger book that was used to keep track of payments for boat stickers and gate cards and the invoices and bank deposits themselves. The discrepancies indicated to Halstead that some of the money received was not deposited into the bank. She brought the matter to the attention of Mumm.

On August 28, Mumm and Brock questioned Garcia at the office. The exact location of the meeting is unclear. For our purposes, it will suffice to note it was not a private closed-door meeting. However, the only other person at the office was Halstead, who had brought the matter to Mumm's attention. Halstead was seated at her desk and overheard portions of the conversation. During the meeting, Mumm presented Garcia with a boat sticker form and a gate card form indicating money had been paid for those two items and asked Garcia: "Where's the money for these two forms?" Garcia said the money was in the bank. Mumm said it was not deposited into the bank according to a QuickBooks report. When Garcia asked to look more closely into the records to try to account for the missing money, Mumm told her no and informed her she would be placed on paid administrative leave while an outside auditor looked into the matter.

On September 1, Garcia received a letter confirming the details of the August 28 meeting, specifically "that the Association has placed [Garcia] on a leave of absence, with pay, while we conduct an audit of the Association's finances." The letter counseled Garcia to "treat this matter as confidential," adding "this is a confidential and internal matter and we cannot reach any conclusions until the audit is completed."

***Relevant Events During the Leave Period***

Poker Flat retained the accounting firm of Atherton and Associates LLP (Atherton) "for the purpose of assisting in determining the amount of cash receipts that may have been misappropriated during the period from January 25, 2014 to August 31,

3

2015." According to Mumm, this was the "audit" he promised Garcia during the August 28 meeting.

Garcia disputes this financial review amounted to an audit, pointing to the following disclaimer in the report generated by Atherton following the review: "We were not engaged to and did not conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you."

In accordance with the standard of review, we accept Garcia's position that Atherton did not conduct an audit. However, the financial review conducted by Atherton revealed significant irregularities in Poker Flat's financial records, including a lack of deposited money to match member payment entries in the ledger book. Garcia does not dispute this.

On September 16, 2015, while Garcia was out on administrative leave and Atherton was in the process of conducting the financial review noted above, Halstead became frustrated while at the office because, among other things, she was doing additional work for less pay than Garcia was making while on leave. She took a break from work and posted the following to Facebook: "I WANT TO DIE[.] [¶] FUCK YOU [EXPLETIVE] YOU CAN SIT ON YOUR FAT ASS AND COLLECT A PAY CHECK FOR 1100 THERE ABOUTS WHILE I DO MY FUCKING JOB AND YOURS, AND YET IM NOT THE FUCKING THIEF NOR THE LIAR BUT AM GETTING PAID THE FUCKING LEAST . . . . . . WHOS [EXPLETIVE] DO YOU HAVE TO SUCK ROUND HERE[?]"[1]

---

[1] Aside from removing two expletives and adding two punctuation marks, we have provided the Facebook post verbatim.

Garcia called Toso and told him about Halstead's Facebook post. Her husband brought a copy of the post to the Poker Flat office and gave it to Toso, who in turn reported Halstead's conduct to Mumm. Halstead's employment was terminated effective immediately.

At some point, apparently during Garcia's leave of absence, Toso approached Garcia's father, who was a former board member of Poker Flat, and "told [him] that there was money missing and if [Garcia] knew where that money was, to come forward." Garcia's father was concerned and reported this conversation to her.

### Garcia's Termination

On October 15, 2015, Atherton provided Poker Flat with the report detailing its review of Poker Flat's sales receipts, ledger entries, and bank deposits. As stated previously, Atherton's report recounted significant irregularities, including a lack of deposited money to match member payment entries in the ledger book. We repeat that Garcia does not dispute this.

The following day, Mumm terminated Garcia's employment with Poker Flat effective immediately. The termination letter explained: "The Association's retained auditor has completed its audit of Association finances. The audit has identified significant irregularities in the Association's finances in matters which were within your direct responsibility as Officer Manager." As Mumm explained in his deposition, while he did not know whether Garcia took the money in question, "these monies were missing and they were under her area of responsibility." He added: "I think she should have recognized that there was a discrepancy between the amount that was taken in and the amount that was deposited."

### Garcia's Lawsuit Against Poker Flat

In Garcia's operative second amended complaint, she asserts several causes of action against Poker Flat. We begin with her ninth and tenth causes of action, alleging Poker Flat wrongfully terminated her employment and retaliated against her in violation

5

of Labor Code section 1102.5.[2]  In these causes of action, Garcia alleges Poker Flat terminated her employment, not because of the missing money noted above, but rather because she complained about and refused to participate in (a) "illegal Board of Director activities," (b) "illegal sexual harassment/discrimination," (c) "violation of alternative work week laws," and (d) "illegal changes to designated pay dates."  We shall recite the facts Garcia relies upon in support of these causes of action when we describe her opposition to Poker Flat's summary judgment motion.

Turning to Garcia's remaining causes of action against Poker Flat, her first cause of action alleges Poker Flat breached a contractual duty to keep her work performance confidential by allowing Halstead to be present when Mumm and Brock questioned her about the missing money and by also disclosing the matter to third parties.  Her second cause of action alleges these actions also violated the implied covenant of good faith and fair dealing.[3]  In Garcia's fifth and sixth causes of action, she alleges Poker Flat is vicariously liable for defamation and intentional infliction of emotional distress (IIED), two torts that were allegedly committed by Halstead when she made the Facebook post described above.  In her seventh and eighth causes of action, Garcia alleges Poker Flat negligently failed to keep her work performance confidential and thereby also violated her right to privacy.  Finally, Garcia's eleventh cause of action alleges Poker Flat engaged in fraud by intentionally misrepresenting the nature of the review Atherton was retained to conduct (by referring to that review as an "audit"), fraudulently concealing the fact that Atherton was not retained to perform an audit, promising an audit with no intent to perform, or at the very least, negligently misrepresenting the nature of Atherton's financial review.

---

[2]     Undesignated statutory references are to the Labor Code.

[3]     Garcia's third and fourth causes of action were alleged against Halstead only.

6

### *Summary Judgment Motion*

Poker Flat moved for summary judgment. With respect to Garcia's wrongful termination and retaliation causes of action, Poker Flat argued Garcia did not allege any specific statutory or constitutional violations as a basis for her claim that the association terminated her employment in retaliation for her complaints about and refusal to participate in any violations of law. Poker Flat also argued Garcia could not establish a prima facie case of wrongful termination or retaliation because she admitted the Board did not discipline her for any complaints she made concerning alleged Board misconduct, there was no evidence of a causal connection between her complaints about sexual harassment in the office and the decision to terminate her employment, and there was also no evidence of a causal link between her complaints about the remaining alleged misconduct and her termination. Finally, to the extent Garcia could establish a prima facie case of wrongful termination or retaliation, Poker Flat argued she could not provide sufficient evidence to overcome its legitimate and nonretaliatory reason for terminating her employment, i.e., the financial discrepancies set forth in Atherton's report.

With respect to Garcia's remaining causes of action, Poker Flat argued "these claims constitute a normal part of the compensation bargain" and therefore "are subject to the exclusive remedy provisions of the Workers' Compensation Act." Poker Flat additionally argued it was entitled to judgment as a matter of law with respect to each of these causes of action because Garcia could not produce evidence establishing each element of the claims. Poker Flat further argued it could not be held vicariously liable for damages arising out of Halstead's Facebook post because Halstead was acting outside the scope of her employment with the association when she made the post.

### *Garcia's Opposition*

Garcia opposed the summary judgment motion. Beginning with her wrongful termination and retaliation causes of action, Garcia argued she "was actually terminated for asserting [Poker Flat] was systematically violating the law." In support of this

assertion, she cited two additional material facts submitted as part of her opposition filing. These claimed facts are as follows: "[Garcia] was terminated for challenging the illegal alternative workweek, information for board meeting minutes, change in payroll, change in hierarchical policy without membership pre-approval, and complaining about sexual harassment"; "[Garcia] was terminated because she was making management accountable to the law. They used the financial irregularities as a pretext to get rid of [her]."

In support of these claims, Garcia cited the following lines from her deposition:

"Q   So, Ms. Garcia, to maybe sort of clarify or summarize, could you list for me the illegal board activities that you believe were a basis for or contributing to or a basis for your termination?

"[Objection made.] [¶]. . . [¶]

"THE WITNESS:   One would be that I challenged the alternative work week schedule. I challenged Stuart Mumm on the information, illegal information in the board meeting minutes. I challenged the payroll, the change of pay date.

"My brain is going. I challenged him on the sexual harassment issues with my clerical employees.

"[Garcia asked to repeat herself.] [¶] . . . [¶]

"Q   I believe you alluded to it earlier. Was one of the illegal activities relating to approval by membership?

"A   Yes. Regarding the policy. The approval of the Policy 001, our hierarchical chart. [¶] . . . [¶]

"Q   All right. And do you have any feelings one way or another about the manner in which Poker Flat terminated you?

"A   Yes.

"Q   And what are those feelings?

8

"A      I feel that -- my feelings are this was one way of getting -- of terminating me legally.  Because the audit didn't -- they didn't even accuse me.  They just held me responsible for what happened.

"And I just feel that this was their way of sidestepping it and taking all of my challenges into consideration to terminate me.

"Q      What do you mean challenges?

"A      The challenges that I've told you about.  Challenging them with the alternative work week schedule.  All of the policy.  I was -- it was -- I was always -- there was always issues and I was always reporting things.  And they didn't like it.

"So I think that they -- because they didn't like what I was doing and this happened to come up, it was, well, okay, you know, she didn't do it, but she was responsible for it.  So let's just terminate her.  Based on what we don't like -- because we don't like her making them accountable to the law.

"Q      So earlier you said this is one way to terminate you legally.  What did you mean by that --

"A      Well --

"Q      -- when you said legally?

"A      I feel that they -- there are standards of terminating somebody.  And I feel that they -- I feel that they couldn't really just say, well, you know, you're challenging me on all this stuff.  We don't like it.  So you're gone.  We'll terminate you.  I feel like they can't just do that.

"So when this all happened, it's like, oh, okay.  Well, this is another thing.  So let's just terminate her.

"I don't know.  Maybe I'm not explaining it correctly, but --

"Q      Well, let me ask you.  Are you saying that you feel that they used this event as a sort of pretext to terminate you?

"A      Yes."

9

In addition to Garcia's "feelings" about the actual reason she was fired, she relied on the fact that Atherton's investigation uncovered "approximately $1,100 in missing funds (during a period of probable revenue of approximately $100,000)" to argue "termination of a solid employee for loss or theft of $1,100 out of $100,000 itself suggest[s] they were out to get [Garcia]." According to Garcia, termination of her employment for this reason was "unreasonable" because Atherton did not conduct an audit as promised, the report issued by Atherton was "inadequate," and "[t]he office was set up to operate without reconciling monies received with bank [deposits]." There must therefore have been another reason: retaliation for Garcia's prior complaints about illegal activities.

Turning to these complaints, we first note the pleadings set the outer boundaries of materiality on a motion for summary judgment. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) As stated previously, Garcia's operative complaint alleges she was terminated because she complained about "illegal Board of Director activities," "illegal sexual harassment/discrimination," "violation of alternative work week laws," and "illegal changes to designated pay dates." Supporting these allegations, Garcia relies primarily on her declaration submitted in opposition to the summary judgment motion.

With respect to claimed illegal Board activities, Garcia's declaration asserts that sometime in 2013-2014, Mumm changed Poker Flat's hierarchical structure without providing 30 days' notice to the association members in violation of the Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.) (Davis-Stirling Act). He did so, she claims, at Toso's request to allow Toso to take over supervision of Halstead. Garcia complained about the violation of law to both Mumm and Toso. Garcia's declaration also asserts that in April 2014, she reported to Mumm that she could not, as he requested, include in Board meeting minutes information that was not discussed at the meeting. Garcia explained to Mumm that doing so would also be a violation of the

10

Davis-Stirling Act. According to Garcia, Mumm's response was: " 'Why do you always make things so difficult for me?' "

Turning to Garcia's complaints regarding sexual harassment, her declaration asserts that in March 2011, one of her staff members complained about Toso making a sexual comment while on the phone in the office. Garcia told Mumm's predecessor about the complaint and thereafter Toso took personal phone calls outside of the office. In October 2012, Garcia made a complaint of sexual harassment on behalf of another office staff member who reported to Garcia that another employee, who was under Toso's supervision, was staring at her cleavage while taking breaks in the office. Garcia reported this behavior to Toso and Mumm. According to Garcia, Toso's response was: " 'I told him not to look at her, she shows cleavage.' " After Garcia's complaint, the offending employee stopped taking breaks in the office for a few months. When he eventually resumed taking his breaks in the office, the employee who made the complaint resigned.

In September 2013, Garcia complained to Mumm about comments Toso made to Halstead about her clothing, specifically that Halstead should " 'think about' " what she wears to the office because "provocative clothing or 'plunging necklines' can also be a form of sexual harassment." Mumm said he would talk to Toso about the matter. Finally, sometime in 2013-2014, Garcia and Halstead discovered pornography on Toso's computer at the office. Garcia reported the matter to Toso, who said he would talk to the employees under his supervision to find out who downloaded the material. No one admitted doing so.

With respect to Garcia's complaints regarding violation of the alternative workweek laws, her declaration asserts that in 2011 she started complaining to Toso about his actions placing employees under his supervision on alternative workweeks without putting the matter to the employees for a vote, which she understood the law to require. According to Garcia, she complained to Toso about the practice until 2014,

11

when the practice was ended, and also gave Toso documentation about alternative workweek law. In June 2015, Garcia went to a human resources seminar, which covered alternative workweek law. At the seminar, Garcia learned that Poker Flat workers did not qualify for alternative workweeks because they were seasonal. She brought this new information to both Toso and the Board. According to Garcia, she did not bring the alternative workweek issue to the Board prior to 2015 because Toso implemented the alternative workweek schedule only one season per year.

Finally, with respect to Garcia's complaint regarding changes to designated pay dates, her declaration asserts that during her leave of absence, Toso changed the employee pay date despite the fact that Garcia was still employed by Poker Flat and this was her area of responsibility, indicating to Garcia that "Toso wanted to take over [her] job responsibilities."

Returning to Garcia's argument in opposition to the summary judgment motion, she argued Poker Flat did not carry its burden of establishing no triable issue of material fact existed with respect to whether these complaints of illegal activities were actually the reason her employment with Poker Flat was terminated. Turning to her remaining causes of action, Garcia argued the workers' compensation exclusivity rule did not apply. She further argued she would be able to prevail on each cause of action asserted against Poker Flat, including those asserted vicariously because Halstead was acting within the scope of her employment as a matter of law when she made the Facebook post.

### Poker Flat's Reply

We need not recount Poker Flat's argument in reply in any detail. It will suffice to note with respect to Garcia's wrongful termination and retaliation causes of action that Poker Flat argued she failed to produce any evidence of a causal connection between her complaints of alleged illegal activity and her termination. In this regard, Poker Flat noted Garcia did not dispute "Atherton's report revealed significant irregularities in Poker Flat's financial records, including a lack of deposited money to match member payment

12

entries in the ledger book." Nor did Garcia dispute this was Poker Flat's stated reason for terminating her employment. Instead, she disputed that Atherton's investigation into this matter was an "audit," concluded from this that "an audit finding could not be a basis for termination," and posited the real reason was her complaints of illegal activities. Poker Flat argued the evidence she proffered in support of this position was insufficient to permit a rational inference that the actual motive for Garcia's termination was retaliatory.

### *Trial Court's Ruling*

The trial court granted summary judgment in Poker Flat's favor. With respect to Garcia's wrongful termination and retaliation causes of action, the trial court concluded Poker Flat's evidence established that Garcia's "termination was for a legitimate, non-retaliatory basis, i.e., financial discrepancies within areas of [her] job responsibilities," and Garcia "fail[ed] to demonstrate any causal nexus" between her complaints about Poker Flat's claimed misconduct, "occurring in almost every case years before her eventual termination," and that termination. The trial court also noted "the unrefuted evidence establishes that [Garcia] was never disciplined or retaliated against in any way for any of the complaints she raised, other than a conclusory contention they were the basis for her termination, and has concurred that she does not believe that anyone on the board of directors or in a management position with [Poker Flat] acted with any intent to harm her at any time."

With respect to the remainder of Garcia's causes of action against Poker Flat, the trial court concluded "all described actions, up to and including [Garcia's] termination, were normal employer actions within the employment relationship, making them subject to the exclusive remedy provisions of the Worker[s'] Compensation Act." The trial court further concluded that Poker Flat was entitled to judgment as a matter of law with respect to each of these causes of action and that the association could not be held vicariously liable for damages arising out of Halstead's Facebook post because Halstead was acting outside the scope of her employment when she made the post.

13

DISCUSSION

## I

## *Summary Judgment Principles*

We begin by summarizing several principles that govern the grant and review of summary judgment motions under section 437c of the Code of Civil Procedure.

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law.  [Citation.]  The burden of persuasion remains with the party moving for summary judgment.  [Citation.]"  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*); Code Civ. Proc., § 437c, subd. (c).)  Thus, a defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  [Citation.]"  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (*o*)(2).)  Such a defendant also "bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to [plaintiff] to demonstrate the existence of a triable issue of material fact."  (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1250.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo."  (*Kahn*, *supra*, 31 Cal.4th at p. 1003.)  "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny.  [Citation.]  We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]"  (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see also *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["responsive evidence that

14

gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

**II**

*Analysis*

Garcia advances several arguments challenging the trial court's ruling granting Poker Flat's summary judgment motion. We need not address each argument. As we shall explain, the trial court's ruling must be affirmed because Garcia's causes of action for wrongful termination and retaliation fail as a matter of law and her remaining causes of action against Poker Flat are either barred by workers' compensation exclusivity or also fail as a matter of law. Finally, we reject Garcia's additional assertion that reversal is required because the trial court declined to set a hearing or expressly rule on her motion for new trial, thereby denying the motion by operation of law when the time period for ruling on the motion expired.

**A.**

**_Wrongful Termination and Retaliation Causes of Action_**

"Although our Legislature has determined that an employment contract is generally terminable at either party's will," in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, our Supreme Court "created a narrow exception to this rule by recognizing that an employer's right to discharge an at-will employee is subject to limits that fundamental public policy imposes." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71, fn. omitted; *Tameny*, at p. 172.) "Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy. Any other conclusion would sanction lawlessness, which courts by their very nature are bound to oppose." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094, overruled on another point in *Green v. Ralee Engineering Co.*, at p. 80, fn. 6.)

15

"Our Supreme Court '[has] established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions [or regulations enacted under statutory authority]. Second, the policy must be "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual. Third, the policy must have been articulated [or well established] at the time of the discharge. Fourth, the policy must be "fundamental" and "substantial." ' [Citations.]" (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1370-1371.)

Section 1102.5 also prohibits an employer from retaliating against an employee for engaging in certain protected activities.[4] In order to assert a cause of action under this provision, a plaintiff must "establish a prima facie case of retaliation," as relevant here, by showing that (1) she "engaged in protected activity," (2) she "was subjected to adverse employment action," and (3) "there was a causal link between the [protected activity] and the adverse action." (*Manavian v. Department of Justice* (2018) 28 Cal.App.5th 1127, 1141.) Where such a prima facie case has been established at trial, the burden shifts to the employer to "provide a legitimate, nonretaliatory explanation for its acts," after which the plaintiff must "show this explanation is merely a pretext for the retaliation." (*Ibid.*)

We need not determine in this appeal whether a decision to terminate Garcia's employment in retaliation for her refusal to participate in what she believed to be violations of the Davis-Stirling Act, reporting sexual harassment engaged in by other

---

**4** These protected activities include "disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation" (§ 1102.5, subd. (b)) and "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." (*Id*., subd. (c).)

employees, or reporting violations of the Labor Code regarding implementation of alternative workweeks, would contravene fundamental and substantial public policy for purposes of establishing a *Tameny* claim.  Nor must we decide whether Garcia has established a prima facie case of retaliation under section 1102.5.  This is because on summary judgment, it is the moving party that bears the burden of establishing its entitlement to judgment as a matter of law.  (See *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 356 (*Guz*).)  Poker Flat did so by providing competent and admissible evidence of its legitimate, nonretaliatory reason for terminating Garcia's employment.  Specifically, Poker Flat terminated her employment because Atherton's report revealed significant irregularities in Poker Flat's financial records, including a lack of deposited money to match member payment entries in the ledger book.  Garcia does not dispute this is what Atherton's report revealed.  Nor does she dispute these financial discrepancies were matters within her direct responsibility as Poker Flat's office manager.

Poker Flat's showing of a nonretaliatory reason for terminating Garcia's employment entitled the association to judgment as a matter of law unless Garcia could "show there was nonetheless a triable issue that decisions leading to [her] termination were actually made on the prohibited basis of [retaliation]."  (*Guz*, *supra*, 24 Cal.4th at p. 360.)  Garcia made no such showing.

In an attempt to do so, Garcia cited evidence that Atherton did not perform an "audit" and argued:  "Since there were no audit findings, an audit finding could not be a basis for termination."  As stated previously, we accept Garcia's position that the investigation conducted by Atherton was not an audit.  But it was an investigation into Poker Flat's finances "for the purpose of assisting in determining the amount of cash receipts that may have been misappropriated during the period from January 25, 2014 to August 31, 2015."  Atherton's report revealed that money taken in and logged in the ledger book was not deposited into the bank.  Regardless of whether or not Garcia took

17

the money in question, Poker Flat was well within its rights to terminate her for failing to safeguard these funds.

Nevertheless, Garcia argues on appeal that "the Atherton report was not a reliable basis for termination" because "it did not provide clear and convincing evidence of wrongdoing." In support of this argument, she relies on section 1102.6, which provides: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." Such reliance is misplaced. This evidentiary standard applies at trial, and the shift in the burden of proof to the employer, along with the heightened clear and convincing evidence standard, occurs only after the employee has demonstrated by a preponderance of the evidence that discrimination or retaliation was a contributing factor in the adverse employment action.

Here, on summary judgment, Poker Flat produced competent and admissible evidence that it did not terminate Garcia's employment for a retaliatory purpose, but rather because of the financial discrepancies described in Atherton's report. If that is true, as previously explained, Poker Flat is entitled to judgment as a matter of law. Only if Garcia can produce competent and admissible evidence establishing the existence of a triable issue of fact with respect to whether this legitimate reason was merely pretext for retaliation would Garcia be entitled to proceed to trial on these causes of action. It would be then, *at trial*, that the evidentiary standard of section 1102.6 would activate. And even then, it would only be after Garcia proved retaliation was a contributing factor in her termination that Poker Flat would be required to prove by clear and convincing evidence that such termination would nevertheless have occurred for legitimate and independent

18

reasons.  In short, the evidentiary standard set forth in section 1102.6 simply does not apply in the context of this case.

Finally, to the extent Garcia's appellate briefing argues she raised a triable issue of fact regarding whether Poker Flat's actual motive for terminating her employment was retaliation, she simply argues:  "The flimsy nature of the Atherton report, and its use to justify termination, supports [Garcia's] claim that [Poker Flat] retaliated against her for reporting illegal misconduct.  The report was a pretext to support termination."  This argument tacitly acknowledges that Garcia's subjective belief about the actual reason for her termination, set forth in her declaration and described in detail above, is not sufficient to create a triable issue of fact.  (See *King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at p. 433 ["plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations"].)  She therefore attempts to bolster her subjective belief with the assertion that the Atherton report was unreliable and therefore must have been a pretext.  We are not persuaded.  " 'Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant.' [Citations.]  Since an employer does not require good cause to terminate an at-will employee, in the normal course of events an employer need not either articulate or substantiate its reasons, except to provide an advance refutation for any inference that the true reason was illegal.  Unless at-will employers are to be held to a good-cause standard for termination, no inference of discrimination [or retaliation] can reasonably be drawn from the mere lack of conclusive evidence of misconduct by the employee."  (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1533.)

The trial court did not err in concluding Poker Flat was entitled to judgment as a matter of law with respect to Garcia's wrongful termination and retaliation causes of action.

19

**B.**

***Remaining Causes of Action and Workers' Compensation Exclusivity***

As stated previously, with respect to the remainder of Garcia's causes of action against Poker Flat, the trial court concluded "all described actions, up to and including [Garcia's] termination, were normal employer actions within the employment relationship, making them subject to the exclusive remedy provisions of the Worker[s'] Compensation Act."[5]  We agree with respect to each cause of action except for Garcia's fifth cause of action for defamation.  That cause of action, however, fails as a matter of law.

"Subject to certain narrowly defined exceptions, the California Workers' Compensation Act provides the exclusive remedy for injuries arising within the course of employment.  [Citation.]  The current code sections pertaining to the exclusivity of workers' compensation are . . . sections 3600 and 3602." (*Pichon v. Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488, 494, fn. omitted (*Pichon*).)

Section 3600 provides in relevant part that where certain conditions[6] are met, "[l]iability for [workers' compensation], in lieu of any other liability whatsoever to any

---

[5]     The Workers' Compensation Act is codified in section 3200 et seq.

[6]     These conditions are listed as follows:  "(1) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.  [¶]  (2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment.  [¶]  (3) Where the injury is proximately caused by the employment, either with or without negligence.  [¶]  (4) Where the injury is not caused by the intoxication, by alcohol or the unlawful use of a controlled substance, of the injured employee. . . .  [¶]  (5) Where the injury is not intentionally self-inflicted.  [¶]  (6) Where the employee has not willfully and deliberately caused his or her own death.  [¶]  (7) Where the injury does not arise out of an altercation in which the injured employee is the initial physical aggressor.  [¶]  (8) Where the injury is not caused by the commission of a felony, or a crime which is punishable as specified in subdivision (b) of Section 17 of the

20

person except as otherwise specifically provided in Sections 3602, 3706, and 4558, shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . ." (§ 3600, subd. (a).)

Section 3602, subdivision (a) provides in relevant part: "Where the conditions of compensation set forth in Section 3600 concur, the right to recover compensation is, except as specifically provided in this section and Sections 3706 and 4558,[7] the sole and exclusive remedy of the employee . . . against the employer. The fact that either the employee or the employer also occupied another or dual capacity prior to, or at the time of, the employee's industrial injury shall not permit the employee . . . to bring an action at law for damages against the employer." (§ 3602, subd. (a).)

Subdivision (b) of this section sets forth three circumstances in which "[a]n employee . . . may bring an action at law for damages against the employer, as if this division did not apply," none of which apply in this case. (§ 3602, subd. (b).)

---

Penal Code, by the injured employee, for which he or she has been convicted. [¶] (9) Where the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, except where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment. . . . [¶] (10) Except for psychiatric injuries governed by subdivision (e) of Section 3208.3, where the claim for compensation is filed after notice of termination or layoff, including voluntary layoff, and the claim is for an injury occurring prior to the time of notice of termination or layoff, no compensation shall be paid unless the employee demonstrates by a preponderance of the evidence that one or more of the following conditions apply: [¶] (A) The employer has notice of the injury, as provided under Chapter 2 (commencing with Section 5400), prior to the notice of termination or layoff. [¶] (B) The employee's medical records, existing prior to the notice of termination or layoff, contain evidence of the injury. [¶] (C) The date of injury, as specified in Section 5411, is subsequent to the date of the notice of termination or layoff, but prior to the effective date of the termination or layoff. [¶] (D) The date of injury, as specified in Section 5412, is subsequent to the date of the notice of termination or layoff." (§ 3600, subd. (a).)

**7** These sections are inapplicable to this appeal.

21

Subdivision (c) then provides: "In all cases where the conditions of compensation set forth in Section 3600 do not concur, the liability of the employer shall be the same as if this division had not been enacted." (§ 3602, subd. (c).)

In *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, our Supreme Court synthesized three principles contained in prior case law pertinent to the scope of these exclusive remedy provisions. "First, '[t]he basis of compensation and the exclusive remedy provisions is an injury sustained and arising out of the course of employment [citation] . . . .' [Citation.] Second, if the injuries did arise out of and in the course of the employment, the exclusive remedy provisions apply notwithstanding that the injury resulted from the intentional conduct of the employer, and even though the employer's conduct might be characterized as egregious. '[A]n employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.' [Citation.] Further, . . . the legal theory supporting such exclusive remedy provisions is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort. [Citations.] The function of the exclusive remedy provisions is to give efficacy to the theoretical 'compensation bargain.' " (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 15-16.)

Garcia does not assert in this appeal that any of the enumerated conditions of compensation set forth in section 3600 were not met. Instead, citing exclusively to an employment litigation treatise, Garcia argues workers' compensation exclusivity does not apply to causes of action alleging defamation, invasion of privacy, or fraud because such

22

misconduct "is outside the normal risks of employment."  She further argues her remaining causes of action "are based on [Poker Flat's] violations of [Garcia's] privacy" and are therefore also exempt from the workers' compensation exclusivity provisions.

We address each of Garcia's remaining causes of action in the order that they are pleaded in her complaint.

## 1.

### *Breach of Contract and Breach of Implied Covenant*

Garcia's first cause of action alleges Poker Flat breached a contractual duty to keep her work performance confidential by allowing Halstead to be present when Mumm and Brock questioned her about the missing money and by also disclosing the matter to third parties.  Her second cause of action alleges these actions also violated the implied covenant of good faith and fair dealing.

The exclusive remedy provisions of the Workers' Compensation Act preclude her causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing if "the 'essence' " of these causes of action involves personal injury "arising within the course and scope of employment," as opposed to purely "[e]conomic contract damages incurred independent of" any personal injury so sustained.  (*Pichon*, *supra*, 212 Cal.App.3d at pp. 500-501; *Muller v. Automobile Club of So. California* (1998) 61 Cal.App.4th 431, 448, disapproved on another point in *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1031, fn. 6.)  Garcia acknowledges these causes of action, while stated in contractual terms, are based exclusively on her assertion that Poker Flat invaded her privacy.  Accordingly, if her invasion of privacy cause of action is barred by workers' compensation exclusivity, so too are these contract claims.  As we explain below, it is.  The trial court therefore properly granted summary judgment with respect to Garcia's first and section causes of action on this basis.

23

## 2.

### *Defamation and IIED*

Garcia's fifth and sixth causes of action allege Poker Flat is vicariously liable for defamation and IIED, two torts that were allegedly committed by Halstead when she made the Facebook post described earlier in this opinion.  Although these causes of action involve the same alleged conduct, they seek to recover damages for different harms, reputational harm in the case of Garcia's defamation cause of action and emotional harm in the case of her IIED cause of action.

In *Howland v. Balma* (1983) 143 Cal.App.3d 899, this court held reputational harm "is not a 'personal injury' . . . or a risk of employment within the purview of the workers' compensation law.  [Citations.]  'In fact, an injury to reputation affects a proprietary interest and as such is not a personal injury at all, any concomitant physical or mental injury notwithstanding.'  [Citation.]" (*Id*. at p. 904.)  Accordingly, even though the alleged misconduct might have arisen within the course and scope of employment, " '[t]he key to whether the [Workers'] Compensation Act precludes a common law right of action lies in the nature of the injury for which plaintiff makes claim, not the nature of defendant's act which plaintiff alleges to have been responsible for the injury.' [Citation.]" (*Ibid*.; see also *Davaris v. Cubaleski* (1993) 12 Cal.App.4th 1583, 1590-1591 (*Davaris*).)  The trial court therefore improperly concluded the exclusivity provisions of the Workers' Compensation Act precluded Garcia's defamation cause of action.

However, the trial court did not err in concluding this cause of action failed as a matter of law.  The trial court concluded Poker Flat could not be held vicariously liable for reputational harm resulting from Halstead's Facebook post because Halstead was acting outside the scope of her employment when she made the post.  We agree.

" 'The tort of defamation "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." ' [Citation.]  To be vicariously liable for the publication of

24

another under the doctrine of respondeat superior, the employee or agent must have been 'acting in the scope of [her] authority and in furtherance of the employer's business.' [Citation.]" (*Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 264 (*Alexander*).)

Here, while Garcia was out on administrative leave and Atherton was in the process of conducting its review of Poker Flat's finances relevant to whether money received for boat stickers and gate cards matched bank deposits during the time period under investigation, Halstead posted the following to Facebook: "I WANT TO DIE[.] [¶] FUCK YOU [EXPLETIVE] YOU CAN SIT ON YOUR FAT ASS AND COLLECT A PAY CHECK FOR 1100 THEREABOUTS WHILE I DO MY FUCKING JOB AND YOURS, AND YET IM NOT THE FUCKING THIEF NOR THE LIAR BUT AM GETTING PAID THE FUCKING LEAST . . . . . . WHOS [EXPLETIVE] DO YOU HAVE TO SUCK ROUND HERE[?]" Halstead made this post while at the office, but was on a break. She either used a work computer to make the post, or used her cell phone while outside smoking a cigarette. As Halstead explained, she was frustrated because, among other things, she was doing additional work for less pay than Garcia was making while on leave.

Absent any evidence that Poker Flat authorized Halstead to communicate on its behalf over social media or that she was purporting to speak on the association's behalf in furtherance of Poker Flat's interests, "a single instance of [lashing out on Facebook while] at work cannot be imputed to [Poker Flat], and thus fails to establish [Garcia's] defamation claim[]." (*Alexander*, *supra*, 46 Cal.App.5th at p. 264.) We also note that Poker Flat immediately fired Halstead when the Facebook post came to light, strongly suggesting the association did not authorize such conduct.

Turning to Garcia's sixth cause of action for IIED, we need not determine whether this claim is barred by the exclusivity provisions of the Workers' Compensation Act (see *Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 754 [IIED claims generally subject to

25

workers' compensation exclusivity where "the basic conditions of compensation are otherwise satisfied [citation], and the employer's conduct neither contravenes fundamental public policy [citation] nor exceeds the risks inherent in the employment relationship"]) because this claim is also based exclusively on Halstead's Facebook post and we have already determined Poker Flat cannot be held vicariously liable for that conduct.

The trial court therefore properly granted summary judgment with respect to Garcia's fifth and sixth causes of action.

**3.**

***Negligence and Invasion of Privacy***

Garcia's seventh and eighth causes of action allege Poker Flat negligently failed to keep her work performance confidential and thereby also violated her right to privacy.

Garcia's argument on appeal suggests that all invasion of privacy claims, as well as all related claims that are based on an alleged invasion of privacy, regardless of their factual content, are exempt from workers' compensation exclusivity. As mentioned, she cites only to an employment litigation treatise in support of this suggestion. That treatise cites only one case in support of the following fairly broad statement: " 'Workers' compensation is not the exclusive remedy for the employer's invasion of an employee's constitutional right of privacy. Violation of such a right cannot be considered "normal employer behavior" within the compensation bargain.' " That case is *Operating Engineers Local 3 v. Johnson* (2003) 110 Cal.App.4th 180 (*Johnson*). We shall therefore discuss this case in some detail and conclude it does not stand for the proposition that all invasion of privacy claims are exempt from workers' compensation exclusivity.

In *Johnson*, *supra*, 110 Cal.App.4th 180, our colleagues at the First Appellate District held the invasion of privacy claim asserted by the plaintiff in that case was not barred by workers' compensation exclusivity. (*Id*. at p. 191.) There, the plaintiff claimed her employer announced, "in the presence of numerous other employees with no interest

26

in the matter," that she would be reprimanded, directed her to write her own letter of reprimand, and then gave a much larger group of employees the minutes of the meeting, which reported the disciplinary action in bold. (*Id*. at p. 184.) The plaintiff sought damages for invasion of privacy based on this conduct. The employer's motion for judgment on the pleadings based on workers' compensation exclusivity was denied. (*Id*. at p. 185.)

Affirming the trial court's decision in this regard, the appellate court first explained the starting point for the analysis was determining the nature of the alleged injury underlying the plaintiff's claim. Only if the plaintiff's claim "is a claim for personal injury or death arising out of the course and scope of employment" does the reviewing court reach "the second step in the exclusivity analysis, which is to determine whether the acts or motives giving rise to the injury constitute ' "a risk reasonably encompassed within the compensation bargain." [Citation.]' [Citation.]" (*Johnson*, *supra*, 110 Cal.App.4th at p. 186; *id.* at p. 185.) Although the trial court cited *Davaris*, *supra*, 12 Cal.App.4th 1583 in support of its denial of the employer's motion, the appellate court explained that *Davaris* involved a cause of action for defamation, which "does not satisfy the conditions of compensation because it is not considered to be based on a personal injury" but rather an injury to reputation. (*Johnson*, at p. 187; *id.* at p. 186.) "In contrast," the court continued, " '[t]he gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community. [Citations.] The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation.' [Citation.]" (*Id*. at p. 187.) Accordingly, unlike defamation, "the nature of the harm from the breach of the right to privacy does constitute a personal injury, bringing such a claim within the

27

conditions of compensation and satisfying the first step of the exclusivity analysis." (*Ibid.*)

Turning to the second step of the analysis, the court explained " 'the exclusive remedy provisions are not applicable under certain circumstances, sometimes variously identified as "conduct where the employer or insurer stepped out of their proper roles" [citations], or "conduct of an employer having a 'questionable relationship to the employment' " [citations], but which may be essentially defined as not stemming from a risk reasonably encompassed within the compensation bargain.' [Citation.]" (*Johnson*, *supra*, 110 Cal.App.4th at p. 188.)

Applying this standard, the court stated: "In our view, it is a close question whether the invasion of [the plaintiff's] privacy that was alleged and proven here may be considered 'a normal part of the employment relationship.' On one hand, reprimands undoubtedly are 'typical employer actions "such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances" [and] do not, by themselves exempt a cause of action from exclusivity.' [Citations.] This remains true even if in imposing discipline tempers flare and the employer engages in conduct rising to the level of intentional infliction of emotional distress. [Citation.] And it is certainly predictable that knowledge, or at least rumors, that an employee has been disciplined will circulate among fellow employees. [¶] Yet, while reprimands and their aftermath may in most circumstances be a normal part of the employment relationship, that is not to say that the intentional dissemination of this information to other employees who have no reason to know of it may not *in extreme circumstances* exceed the known and inherent risks of the workplace." (*Johnson*, *supra*, 110 Cal.App.4th at pp. 189-190, fn. omitted, italics added.) The court concluded the invasion of privacy alleged and proved by the plaintiff "exceed[ed] what may be considered normal employer behavior within the compensation bargain." (*Id.* at p. 190.)

Unlike *Johnson*, the invasion of privacy alleged in this case does not exceed the scope of ordinary employer behavior encompassed within the compensation bargain. Returning to Garcia's operative complaint, as it delimits the scope of the issues on summary judgment (see *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381), she alleges Poker Flat committed negligence and also violated her right to privacy by "[a]llowing Halstead access to [Garcia's] confidential information," which resulted in Halstead making the Facebook post noted above, and also by "disclosing said information via conversations to third parties." With respect to revealing confidential information to Halstead, Garcia does not claim Poker Flat intentionally did so. Instead, she claims Mumm and Brock negligently allowed Halstead to remain in the office while they questioned her concerning the financial discrepancies. However, these financial discrepancies were reported to them *by Halstead*. Thus, she did not learn anything she did not already know. This is a very different situation than publicly reprimanding an employee in a meeting attended by numerous other employees with no interest in the matter and then making the reprimand more public by widely distributing the meeting minutes.

With respect to disclosing information to third parties, Garcia provides evidence that Toso approached her father, who was a former board member of Poker Flat, and "told [him] that there was money missing and if [Garcia] knew where that money was, to come forward." Assuming, without deciding, that Poker Flat can be held responsible for Toso's conversation with Garcia's father, we do not consider this to rise to the level of "extreme circumstances [that] exceed the known and inherent risks of the workplace." (*Johnson*, *supra*, 110 Cal.App.4th at p. 190.)

The trial court therefore properly granted summary judgment with respect to Garcia's seventh and eighth causes of action.

## 4.

### *Fraud*

Garcia's eleventh cause of action alleges Poker Flat engaged in fraud by intentionally misrepresenting the nature of the review Atherton was retained to conduct (by referring to that review as an "audit"), fraudulently concealing the fact that Atherton was not retained to perform an audit, promising an audit with no intent to perform, or at the very least, negligently misrepresenting the nature of Atherton's financial review.

The employment litigation treatise Garcia cites in support of her argument that her fraud claim is exempt from the exclusivity provisions does not actually support that argument. Instead, it cites a single case, *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, for the proposition that the exclusivity provisions do not bar causes of action alleging " '[e]motional distress caused by Employee's reliance on Employer's **fraudulent misrepresentations** to induce him to become an employee.' " (Boldface added by Garcia.) That is obviously not the situation here, and Garcia does not even attempt to argue the facts of this case are analogous to the situation in *Lenk*. She simply concludes, based solely on the treatise, that her fraud claim is not barred by the exclusivity provisions because "fraud is outside the normal risks of employment."

We have given Garcia some leeway in addressing certain "arguments" that are not adequately briefed. We draw the line here. To avoid forfeiture of this claim of error, Garcia had the burden to support her argument with both citation to relevant authority and analysis of how that authority applies to the facts of this case. (See, e.g., *People v. Hardy* (1992) 2 Cal.4th 86, 150; *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1159; *People v. Sangani* (1994) 22 Cal.App.4th 1120, 1135-1136.) She has not done so. This claim of error is therefore forfeited.

**5.**

***Punitive Damages***

Finally, having concluded the trial court properly granted summary judgment with respect to each of Garcia's tort claims, we must also reject her contention that the trial court improperly determined she was not entitled to punitive damages. As Poker Flat correctly observes, in order to obtain punitive damages, Garcia must succeed on an underlying tort claim. (See *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 960-961 ["award of punitive damages may not be sustained" in the absence of a successful "fraud or other tort cause of action"; "statutory scheme for allowance of punitive damages requires *both* a tort action *and* a finding of 'oppression, fraud, or malice' "].)

**C.**

***Garcia's Motion for New Trial***

The trial court entered the order granting Poker Flat's summary judgment motion on April 9, 2018. Notice of entry of the order was filed on April 16. Judgment was entered in favor of Poker Flat the following day. Thereafter, on May 9, Garcia filed a motion for new trial. The trial court did not set a hearing date or formally rule on this motion, resulting in denial of the motion by operation of law upon expiration of the time limit specified in Code of Civil Procedure section 660.[8] (See *Arvizu v. Imperial Phonograph Service, Inc.* (1953) 120 Cal.App.2d 321, 322 (*Arvizu*).) Garcia's notice of appeal purports to appeal from both "the final judgment in this matter on April 17, 2018" and "the order denying a motion for new trial entered by operation of law on June 22, 2018."

---

[8]     Garcia moved to disqualify the trial judge for declining to set a hearing on her new trial motion. This disqualification motion was stricken for failure to follow the procedural requirements of Code of Civil Procedure section 170.1.

As this court explained long ago in *Strauch v. Bieloh* (1936) 16 Cal.App.2d 278, there is no right to appeal from an order denying a motion for new trial. Accordingly, Garcia's "purported appeal from the automatic denial of [her] motion for a new trial is ineffectual and it is therefore dismissed." (*Id.* at p. 280.) However, "[a]n order denying a motion for new trial may be reviewed on an appeal from the judgment even though denied by operation of law." (*Bramble v. McEwan* (1940) 40 Cal.App.2d 400, 416; *Lewith v. Rehmke* (1932) 215 Cal. 241, 243.) Because Garcia also appeals from the judgment, we shall entertain her arguments regarding the automatic denial of the motion for new trial.

Garcia argues Code of Civil Procedure section 661 makes it mandatory to set a hearing on a new trial motion and asserts the trial court's failure to do so requires reversal. Not so.

"An order granting summary judgment is properly challenged by a motion for a new trial. [Citation.] 'This is so, even though, strictly speaking, "summary judgment . . . is a determination that there shall be no trial at all." ' [Citation.] The new trial motion may seek reversal of the summary judgment on 'any available statutory ground for a new trial' [citation], which encompasses contentions that there are triable issues of fact [citation]." (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176.)

As stated previously, a trial court's failure to rule upon a new trial motion within the statutorily prescribed period results in a denial of the motion by operation of law. (*Arvizu, supra,* 120 Cal.App.2d at p. 322.) "[T]he merits of a motion for a new trial denied by operation of law may be reviewed upon appeal in the same manner as if expressly denied by the court." (*In re Shepard's Estate* (1963) 221 Cal.App.2d 70, 73.) "This rule is manifestly a just one because if it were otherwise, a litigant would be deprived of [her] right to an appellate review of the proceedings in all cases in which the

32

trial court intentionally declined to act within the authorized time or intentionally chose to deny the motion in this manner." (*Ibid.*)

Thus, Garcia is entitled to our review of the automatic denial of her new trial motion. However, while we agree with her position that a hearing is required in order for the trial court to properly act on the motion (*Avery v. Associated Seed Growers, Inc.* (1963) 211 Cal.App.2d 613, 625 ["applicable statutes clearly provide for a hearing and determination of a motion for new trial"]), this patently does not mean, as Garcia argues, that the failure to hold such a hearing and expressly rule on the motion requires reversal of the automatic denial of the motion. The trial court did not act on the motion without holding a hearing. It did not act on the motion at all. Instead, the trial court allowed the time period within which to act on the motion to expire, resulting in denial of the motion by operation of law. Garcia cites this court to no authority, nor have we found any on our own, requiring reversal of an automatic denial of a new trial motion based solely on the failure to hold a hearing.

We finally note that reversal in these circumstances would result in an idle act. This is because we have already concluded the trial court properly granted summary judgment in favor of Poker Flat. This is what Garcia's new trial motion challenged. Stated simply, a hearing on Garcia's new trial motion would not result in that motion being successful.

## DISPOSITION

The judgment is affirmed.  Poker Flat is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
HOCH, Acting P. J.


We concur:


/s/
RENNER, J.


/s/
KRAUSE, J.